**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| LORI BOX o/b/o P.B.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:15 CV 10 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review on the final decision of defendant Commissioner of Social Security denying the application of Lori Box on behalf of her son, P.B.P., for supplemental security income benefits under Title XVI of the Social Security Act. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 11.) For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is reversed and remanded for an award of a closed period of disability and resulting benefits.

## I. BACKGROUND

Plaintiff P.B.P. was born on September 7, 2000. His mother filed an application for supplemental security income on his behalf on October 3, 2007. She alleged an onset date of September 1, 2007, asserting disability due to Attention Deficit Hyperactive Disorder (ADHD), impulsive explosive disorder (IED), and oppositional defiant disorder (ODD). (Tr. 86–88.) Plaintiff's claims were denied initially, and she requested a hearing before an ALJ. (Tr. 36–47, 55.)

On June 12, 2009, following a hearing, the ALJ issued a decision denying plaintiff's application. (Tr. 36.) The Appeals Council denied the request for review on February 22, 2010. (Tr. 527–28.) This district court remanded the case to the commissioner with instructions to the ALJ to consider all of the relevant evidence of P.B.P.'s impaired social functioning. (Tr. 473–523); Box v. Astrue, 2011 WL 4478563, No. 2:10 CV 28 FRB (E.D. Mo. Sept. 27, 2011).

On June 12, 2012, following a second hearing on May 14, 2012, the ALJ again denied benefits. (Doc. 532–46.) The decision was appealed to the Appeals Council, which remanded the case to the ALJ in order to address relevant, but ignored, evidence, as well as to evaluate several medical and educational opinions in the record. (Doc. 551–54.) On remand two additional hearings were held, and the ALJ found plaintiff was not disabled on September 26, 2013. (Doc. 351–77.)The Appeals Counsel denied review on February 12, 2014. (Doc. 345–47.) Thus, the ALJ decision dated September 26, 2013 stands as the final decision of the Commissioner.

## II. MEDICAL AND EDUCATIONAL HISTORY

In 2007, P.B.P. was enrolled in the Kansas City Center School District and had speech problems which were exacerbating his other behavioral problems. Plaintiff had a break down on the first day of school and had a suicidal ideation on the second day of school. (Tr. 130, 217–21.)

On September 9, 2007, P.B.P. was admitted to the Research Psychiatric Center in Kansas City following a break down at school. His Global Assessment Function (GAF)[1] score at time of admission was 43.[2] He was admitted due to his anger and aggressive outbursts while at school. He was able to complete his assigned school work while

---

[1] A Global Assessment of Functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th Ed. Text Revision 2000) (DSM-IV-TR).

[2] A GAF score of 41-50 indicates "serious symptoms… or any serious impairment in social, occupational, or school functioning." Id.

admitted.  He also participated in individual and group counseling sessions.  (Tr. 211–14, 240–48.)

Between September 18, 2007 and November 11, 2007, P.B.P. saw Dr. Lee T. Weng, M.D., five times.  Plaintiff was prescribed Ritalin for ADHD and Risperdal for depression and anxiety symptoms.  Dr. Weng added Adderall for ADHD on November 14, 2007.  (Tr. 215, 255–56.)

On November 16, 2007, P.B.P. was admitted to Two Rivers Psychiatric Hospital in Kansas City, Missouri for anger and aggression and in order to stabilize his mood.  His school, Boone Elementary, provided the hospital with an evaluation.  He has fair attendance but his aggression toward adults and his unsafe behavior has resulted in suspensions.  He is immature, impulsive, cannot accept consequences, has extreme anxiety and obsessive tendencies, and threatens suicide.  His behavior has improved with medication.  Two Rivers prescribed him Risperdal and Adderall.  He was discharged on November 19, 2007.  (Tr.  208–10, 285–87.)

P.B.P.'s school conducted a revaluation of his Individual Education Plan (IEP) on December 4, 2007, because of his recent aggression and outburst problems.  Plaintiff is deficient in basic reading skills, as well as, reading and listening comprehension.  He can be disruptive and defiant in class and teachers are concerned about his aggression, anxiety, depression, atypicality, and withdrawal.  Plaintiff completed the Wechsler Intelligence Scale for Children-IV (WISC-IV) and was found to be average in verbal comprehension and perceptual reasoning, but low average in his working memory and processing speed.  His full scale IQ was 87, indicating his intelligence is in the low average range.  P.B.P. had been diagnosed with a mood disorder (not otherwise specified), and attention deficit disorder.  He was prescribed Risperdal and Adderall. (Tr. 694–703.)

Boone Elementary School performed an evaluation on March 10, 2008, of P.B.P when he was in the first grade.  In the domain of acquiring and using information he has very serious problems in reading and comprehending written material and serious problems in providing organized oral explanations and descriptions.  In the domain of

attending and completing tasks P.B.P. has serious problems with multi-step tasks and obvious or slight problems in all other categories. He has problems hourly in changing from task to task. In the domain of interacting and relating with others P.B.P. has very serious problems with expressing his anger appropriately, respecting and obeying authority figures, relating experiences and telling stories, and using language appropriate to the situation. He had no problem making or maintaining friendships. He is on a behavior modification plan. In the domain of moving about and manipulating objects, he has no problems. In caring for himself, he cannot handle frustration, or use appropriate skills to calm himself. He has serious problems asking for help, being patient, and appropriately asserting emotional needs. (Tr. 112–18.)

On March 27, 2008, a state-appointed psychiatrist, Jamie C. Prestage, Ph.D., performed an evaluation of P.B.P. by using medical records as well as conducting an in-person interview. P.B.P.'s behavioral problems began in December 2006 and he has been previously diagnosed with ADHD and a mood disorder. He has been hospitalized two times and is currently on Risperdal, amphetamines (for ADHD), and Depakote (for mania). His Slossen Intelligence Test score was 90. He receives special education and has been suspended four times this school year. Plaintiff scored a 92 on the Asperger Syndrome Diagnostic Scale, which indicates a probability of Asperger Syndrome. Dr. Prestage diagnosed him with Asperger Syndrome, mood disorder (not otherwise specified), anxiety disorder (not otherwise specified), and ADHD. (Tr. 132–35.)

On May 21, 2008, P.B.P.'s paraprofessional provided an assessment of him. She wrote that P.B.P. must be right 100% of the time. Test taking is very stressful, because if plaintiff is not right he will have a meltdown. While he does intimidate other students, she assessed he does so without the real intention to harm others. He obsesses about things and continues to do the activity until he gets it right or has a complete meltdown. (Tr. 132–35.)

On June 25, 2008, an APRN saw P.B.P. at Comprehensive Psychiatric Associates assessed his GAF at 50,[3] and was considering lessening his medications in order to see his baseline without medications. On July 17, 2008, plaintiff was taking Depakote, but his mother lost the prescription. He continued to take Risperdal and Adderall. (Tr. 290–92.)

Plaintiff's report card for quarters 3 and 4 of the first grade indicated he had Cs in reading, but As and Bs in math. His social development was below expectations. (Tr. 169–71.)

On September 10, 2008, P.B.P. had a breakdown at school. He threw desks and chairs in a room with other children. Then he crawled around on the floor and licked the carpet. (Tr. 222–25.)

After not being able or refusing to do a math problem on September 18, 2008, P.B.P. had a breakdown and threw himself on the floor. He had to be taken home early by his grandfather. (Tr. 225–27.)

On September 24, 2008, Sultanan Jahan, M.D., provided a second opinion that diagnosed P.B.P. with ADHD, IED, and a mood disorder. He was on Depakote and amphetamines. His GAF was 56.[4] (Tr. 333–37.)

On October 21, 2008, plaintiff's IEP was reassessed. The report noted a "vast improvement in his ability to function in the regular education classroom." His WISC-IV IQ score was 87, with verbal comprehension at 96, perceptual reasoning at 94, working memory at 80, and processing speed at 84. (Tr. 182–92.)

On November 12, 2008, Ellen A. Horwitz, Ph.D., at the University of Missouri performed a psychological assessment. P.B.P.'s current medications were Adderall, Risperdal, and Depakote. He was diagnosed with ADHD and IED. He was twice hospitalized for three to five days in 2007. The school does have a specialized plan for

---

[3] A GAF between 41 and 50 indicates that there are serious symptoms including suicidal ideations or severe obsessional rituals, or that there are serious impairments in social, occupational or school functioning. Id.

[4] A GAF between 51 and 60 indicates that moderate symptoms or difficulty in social, occupation, or school functioning. Id.

P.B.P. when he begins to have a meltdown. P.B.P.'s IQ was 87, indicating a low average IQ. He was normal on the hyperactivity scale. He had two meltdowns during the testing, but completed all of the examinations. Dr. Horwitz diagnosed plaintiff with ADHD, IED, and a mood disorder (not otherwise specified). P.B.P.'s GAF was 48. (Tr. 297–309.)

On January 8, 2009, plaintiff was suspended for three days due to out of control defiance to school authority figures. (Tr. 228.)

On January 23, 2009, plaintiff was seen by Dr. Jahan at Burrell Behavior Health Clinic for a psychological assessment follow-up. Dr. Jahan began the process to gradually eliminate plaintiff's ADHD prescriptions, Risperdal and Adderall. Plaintiff admitted he has problems controlling his anger. His last episode, January 8, 2009, resulted in plaintiff's suspension and an apology to his classmates for his disruptive behavior. (Doc. 294–96, 316–19.)

Plaintiff saw Dr. Jahan on February 6, 2009. Plaintiff's medications were changed. Dr. Jahan added Zoloft for depression and increased his Depakote. (Doc. 315.)

On February 10, 2009, plaintiff was given an EEG, which was within normal range. (Doc. 311.)

Plaintiff had an episode at school on March 30, 2009. He began crying and yelling, then he ran around the classroom, pushing down desks and chairs. He proceeded to shove his head into a toilet. Finally, he ran out of the school and the police had to be summoned to find him. He ran across the street from the school and hid in the woods. He received a two-and-a-half day suspension from school. (Doc. 229–31.)

On April 17, 2009, plaintiff's school increased his special education time due to his frustration and inability to perform in math. His second grade, third quarter report card on April 22, 2009, noted mostly As and Bs, with his only C being in math. (Doc. 164–66, 175–81.)

On April 28 2009, P.B.P.'s his second grade teacher, reported her assessment. In the domains of acquiring and using information, plaintiff has very serious problems in reading and comprehending written material, expressing ideas in writing, and learning

new material.  He has serious problems in comprehending and doing math problems.  However, he is better than his earlier assessment in most categories.  In the domain of attending and completing tasks, plaintiff has no serious or very serious problems.  His teacher noted that he is not willing to make careless mistakes and will stay on a problem and cause major disruptions if he believes he has incorrectly answered it.  Plaintiff has very serious problems in the domain of interacting and relating with others.  Monthly, he has problems controlling his anger and seeking appropriate attention.  P.B.P. has his own behavior modification plan that allows him to step away from a situation and calm himself down.  Plaintiff has no issues in the domain of moving about and manipulating objects.  He has very serious and serious problems in the domain of caring for himself.  He has daily issues with handling his own frustration, as well as, identifying and appropriately asserting his emotional needs.  He has serious problems in responding appropriately to changes in his mood.  Mrs. Harvey believes that P.B.P. knows he is acting badly and chooses to do so.  When there are consequences to his behavior, P.B.P asks for another chance.  (Doc. 156–63.)

Plaintiff went to Burrell Behavior Health seven times between June 2009 and April 2011.  These visits were for medication management and no major issues or changes to his medications were noted.  (Doc. 782–89.)

During a visit to Burrell Behavior Health on May 3, 2011, P.B.P.'s mother noted how much better his behavior was with the increase of P.B.P.'s Zoloft prescription.  She remains worried about his behavior at school.  (Doc. 780–81.)

On August 2, 2011, P.B.P. went to Burrell Behavior Health for a routine medication management appointment.  Only Zoloft and Abilify were listed as P.B.P.'s prescriptions.  (Doc. 778–79.)

On September 23, 2011, Salisbury R-IV School conducted a review of P.B.P's IEP.  It was noted that his coping skills continued to improve and he has developed coping mechanisms to prevent outbursts.  He is still behind in math and reading.  (Doc. 677.)

On February 1, 2012, plaintiff saw Nurse Lisa Baeza at Burrell Behavior Health. His Abilify was increased and he continued on Zoloft. (Doc. 773–74.)

On February 21, 2012, plaintiff had to be removed from school after an episode during a science test and then during gym class. He refused to work on the second part of a science test and laid on the classroom floor until the end of the exam. He then went to gym class, where, after losing a kickball game, he flipped off the coach and threatened to kill himself. Coach Ryan Taylor requested P.B.P. be banned from gym class until his behavior is more appropriate. (Doc. 672–74.)

P.B.P. was disciplined at Salisbury Elementary on February 27, March 21, and April 23, 2012, for various defiance and aggression problems. The last episode resulted in a three day out-of-school suspension. (Doc. 704–09.)

On May 2, 2012, Nurse Baez at Burrell Behavior Health saw P.B.P. and increased his Abilify. His other prescriptions included Zoloft and melatonin, to assist in sleep. (Doc. 833–34.)

On June 20, 2012, Nurse Baez noted plaintiff has been having more problems at school and home. P.B.P. went to the emergency room, but his mother took him home against physician's advice before P.B.P. could be seen. The mother had been lax on ensuring plaintiff took his medications. (Doc. 831–32.)

On August 3, 2012, Nurse Baez noted that plaintiff is now only being seen every two to three months for medication management. His medications included Zoloft, Abilify, and melatonin. (Doc. 829–30.)

On September 17, 2012, plaintiff saw Nurse Baez and was started on a trial of Intuiv for his aggression issues. His diagnoses were IED, ADHD, and anxiety disorder (not otherwise specified). His medications included Zoloft, Abilify, and melatonin.

On September 20, 2012, Salisbury Elementary School reevaluated plaintiff's IEP for the sixth grade. His ability to handle his own problems continues to improve. He is letting others know that he has a problem before he has a full breakdown. He still requires assistance in reading and math, which are at fourth and third grade levels respectively. (Doc. 716–62.)

On November 29, 2012, Nurse Baez saw plaintiff and noted although he still has periodic outbursts, there have been no major problems at school this school year. His mother is keeping him on his medications as prescribed. (Doc. 825–26.)

On December 13, 2012, plaintiff was assessed at the University of Missouri. His medications at the time were Zoloft, Intuniv, melatonin, and Abilify. Plaintiff and his mother were interviewed by Connie M. Brooks, Ph.D, and Jessica Harvath, M.Ed. P.B.P. has a depressed mood, angry outbursts, anxiousness, worthlessness, suicidal and homicidal ideations, crying spells, and is easily distracted. He sees a psychiatrist. His responsibilities include feeding the dogs, picking up in the living room, and taking out the trash. P.B.P.'s mother stated that bad grades and mistakes can "easily put him in a rage" and his teachers walk on eggshells around him. If he does not get his way or loses a competition, he will have an extreme outburst. He has previously waived a knife and fired BBs at his older sister. Plaintiff reports his brother kicks, bites, and punches him. He attends speech therapy class and has special classes for reading and math. He states that he gets mad and is not really suicidal or homicidal.

Plaintiff and the adults in his life completed several assessments. Plaintiff's mother assessed his problems as worse than reported by his teachers on the Behavioral Assessment System for Children (BASC-2). His teachers assessed no clinically significant issues but several items indicated that plaintiff is "at-risk" for problems. The Disruptive Behavior Rating Scale plaintiff was within normal limits as assessed by all of his teachers, but again his mother rated him higher. Plaintiff could not be conclusively diagnosed with ADHD using the Conners' Continuous Performance Test (CPT-II). The Beck Youth Inventory (BYI-2) showed that P.B.P. is average regarding his anxiety, depression, anger and disruptive behavior.

The final assessment indicated that plaintiff does not meet the criteria for an IED or an oppositional defiant disorder diagnosis. Rather he has ADHD, combined type; enuresis, the inability to control urination; encopresis, the inability to control bowel movements; chronic adjustment disorder with mixed anxiety and depressed mood; and, a GAF of 60. (Doc. 790–809.)

On January 4, 2013, plaintiff was admitted to Royal Oaks Hospital due to aggression resulting from noncompliance with his medication for at least a week. His mother stated she misplaced his medication during a week-long trip to Kansas City. Plaintiff's intake GAF was 30.[5] Plaintiff was administered Prozac (for depression, panic attacks, or obsessive compulsive disorder), Lamictal (for bipolar disorder, or manic depression), and Risperdal. Plaintiff was discharged on January 11, 2013 with a GAF of 72.[6] (Doc. 811–23.)

On February 15, 2013, Nurse Baez saw plaintiff with his mother and brother. P.B.P. is anxious but otherwise normal. He would continue on Risperdal, Lamictal, and Prozac. Plaintiff's ADHD is no longer a problem; therefore, he is no longer on Intuniv. (Doc. 837–38.)

**First ALJ Hearing**

The ALJ conducted a hearing on May 15, 2009. (Tr. 566–90.) Plaintiff testified to the following. He was born on September 7, 2000 and was eight-years old at the time of the hearing. He has finished the second grade, where he attends special class to help him learn to read. He has a special teaching assistant who helps him with reading and math. Plaintiff used to attend church and play with other children, but the family no longer goes. He is responsible for taking out the trash at home. (Tr. 573.)

Plaintiff has "meltdowns" at school. For example, after believing he answered a question on a test wrong he had a meltdown and stuck his head in the toilet and then ran outside the school. Plaintiff estimated that this meltdown lasted about an hour. These types of outbursts happen a little bit every day. Plaintiff is allowed to leave the classroom and walk around in order to calm down. (Tr. 574.)

---

[5] A GAF between 21 and 30 indicates a person's behavior is considerably influenced by delusions or hallucinations. There could also be serious impairment in communication or judgement and a possibility of an inability to function in almost all areas of life. Id.

[6] A GAF between 71 and 80 indicates there are transient and expectable reactions to psychological stressor. There is no more than slight impairment in social, occupational, or school functioning. Id.

Plaintiff's mother then testified regarding her son. He still has meltdowns, but the school handles them better. His meltdowns began in the second half of kindergarten. Plaintiff wants to be able to stay in school rather than have his mother come and pull him out of school due to a meltdown. He has only run away from the school building one time during a meltdown. Plaintiff's mother has had to pick plaintiff up from school five to seven times this year, which is fewer times than last year when he was in Kansas City. (Tr. 578–80.) Plaintiff's mother believes that her son obsesses over all activities, and that if his work is not perfect he has to redo it. Even if plaintiff's work is fine, he believes it is not and loses control of his emotions. Plaintiff must finish an activity before he can move on to another activity. When he plays board games, he must win or he will knock all of the pieces off the board. Plaintiff can do chores at home sometimes, but he must be reminded to finish them from time to time. (Tr. 580–81.) He can stay on task, because he wants to finish his work. (Tr. 583.) Plaintiff has no difficulties or aggression with other children. He can be mean and aggressive with teachers or school staff. Plaintiff's mother feels that when he is in a meltdown, the school staff has to just let plaintiff finish the fit and go from there.

Plaintiff's meltdowns can occur at any time over any little thing. (Tr. 584.) He has continued to wet the bed at night, but his doctors have not identified a reason for the behavior. (Tr. 589.) He currently attends therapy with a psychiatrist, an outside counselor, and a school counselor. He was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), but his mother thought that his psychiatrist recently ruled that out because he was removed from the Adderall for a few months with no issues. Plaintiff currently takes Risperdal for obsessive compulsive disorder, Depakote for certain psychiatric conditions, Metadate for ADHD, and Zoloft for depression. (Tr. 584.) His medications were just changed within the last month, so his mother cannot assess their effectiveness yet. (Tr. 585.)

**First Decision of the ALJ**

On June 12, 2009, the ALJ found that plaintiff was not disabled. The ALJ determined that plaintiff had the severe impairments of attention deficit hyperactivity disorder, mood disorder-not otherwise specified, and intermittent explosive disorder. (Tr. 42.) None of these impairments met or medically equaled a listed impairment. Also the claimant had no limitation in the domain of moving about and manipulating objects, and a less than marked limitation in four domains: acquiring and using information; attending and completing tasks; interacting and relating with others; and, health and physical well-being. Plaintiff had a marked limitation in caring for himself. (Tr. 44–46.)

Plaintiff appealed the decision to the appeals council and the ALJ's decision was affirmed on February 22, 2010. (Doc. 527–29.) On September 27, 2011, this district court reversed and remanded the decision, finding the ALJ did not properly consider all the evidence associated with P.B.P.'s limitations in social interactions and his ability to interact and relate with others. (Tr. 473–523.)

**Second ALJ Hearing**

On remand, the ALJ held a hearing on May 14, 2012. (Tr. 402–35.) A psychological expert, Nancy Winfrey, Ph.D., testified. Dr. Winfrey examined all the exhibits before testifying to the following. She agrees that plaintiff has ADHD, anxiety disorder-not otherwise specified, and a mood disorder-not otherwise specified. Plaintiff no longer wets the bed, but, rather, urinates and defecates on himself during the day. This is a recent problem, and therefore, has not been diagnosed by a medical professional. Dr. Winfrey opined that plaintiff's speech problems, intermittent explosive disorder, and oppositional defiance disorder are not well-established or supported diagnoses. Plaintiff does not have autism. Plaintiff's conditions and symptoms do not meet or equal a listing. In the six domains of functioning, plaintiff is less than markedly limited in acquiring and using information. Plaintiff is on the honor roll most of the time and his listed deficits in reading and math are not current. In completing tasks plaintiff is

less than marked. His symptoms and abilities have improved over the years and any symptoms he currently has are not prominent. Getting along with, interacting with, and relating to others is also less than marked. His symptoms of aggression and irritability have lessened with time. Plaintiff has had isolated incidents, but also has had times where he has been described as "doing really good" and no behavioral problems at all. The fourth domain, manipulating objects has no limitations. The fifth domain, taking care of oneself, is less than marked. For the sixth domain, health and typical well-being, Dr. Winfrey deferred to the mother's position. (Tr. 402–15.)

Plaintiff and his mother testified to the following. Plaintiff was born on September 7, 2000, and was eleven years old at the time of the hearing. He is currently on Zoloft and Abilify. Plaintiff's doctors have ruled out Autism as a diagnosis. Plaintiff will occasionally have behavioral problems, such as striking his older brother or sister. He will be playing baseball the whole summer and likes to play video games. He goes to the park with his friends and has played on youth sports teams. He usually gets along with his friends and teammates, but does not visit them at their houses. (Tr. 418–23.)

He rides the bus, on his own, to and from school. He was entering sixth grade at the time of the hearing and has never been held back a year. He can focus on tasks, at home or at school, when told to do something, depending on his mood at the time. He usually makes all As and Bs, but occasionally makes a C in his classes. Plaintiff goes to regular and special small-sized classes for math and reading while at school. The school allows plaintiff to self-soothe by separating himself from other students when he feels the need to. He does this at least one a week. It could take plaintiff anywhere from 15 minutes to an hour to calm himself down. (Tr. 418–19, 421–35.)

**Second ALJ Decision**

The ALJ determined that plaintiff was not disabled on May 12, 2012. The ALJ found that plaintiff had three severe impairments: attention-deficit hyperactivity disorder, anxiety, and a mood disorder-not otherwise specified. The ALJ found that none of these disorders either met or equaled a listing. Finally, the ALJ found that plaintiff had

a less than marked limitation in four domains: acquiring and using information; attending and completing tasks; interacting and relating with others; and, caring for oneself. Plaintiff had no limitations in two domains: moving and manipulating objects and health and physical well-being. (Tr. 535–46.)

On November 20, 2012, the Appeals Council found that the ALJ did not fully comply with this court's remand order from September 27, 2011. Specifically, "the ALJ did not discuss any of the opinion evidence from examining sources or assign any weight to them" when analyzing plaintiff's limitations in the domain of interacting and relating with others. The ALJ relied solely on the testimony of a non-examining medical expert rather than the substantial evidence in the record from five sources. The decision was remanded to the ALJ for additional consideration. (Tr. 553–54.)

**Third and Fourth ALJ Hearings**

On April 2, 2013, an ALJ held a third hearing. The hearing was reset, because the ALJ wanted to find a psychiatrist to testify regarding the reports that were not discussed in the second ALJ opinion. (Tr. 438–44.)

On July 10, 2013, a fourth hearing was held. Plaintiff was present along with counsel, his mother, and a consulting psychological expert. Plaintiff testified to the following. Plaintiff is 12 years old and will be entering the seventh grade. He plays football and spends his summer at the pool playing with other children he knows from the neighborhood. (Tr. 448–51.) Plaintiff's mother testified to the following. Plaintiff was suspended from school at least once and had his bus-riding privileges revoked for the last two months of school. Plaintiff has had problems with his bladder and bowels for at least the last two years. Plaintiff gets along with his siblings, but they sometimes fight. Plaintiff has had no problems with other children at the neighborhood pool this summer, and he can go there on his own or with his siblings. He plays football, but he prefers to be alone and plays video games and watches TV. In class plaintiff has had instances where his emotions have exploded and the school has removed him from the class. These occurrences have not happened as often as before. (Tr. 448–51, 464–70.)

The consulting psychologist Thomas England, Ph.D., testified to the following. Plaintiff has been diagnosed with ADHD, and that diagnosis is supported by evidence in the record. Although Autism was considered, it is not supported as a diagnosis. Although psychologists do not often consider diagnosing a personality disorder in children twelve and younger, plaintiff has symptoms and has been diagnosed by his treating physicians with oppositional defiance disorder and intermittent explosive disorder. Plaintiff is also diagnosed with anxiety, but Dr. England ruled out obsessive compulsive disorder. The last mental diagnosis would be affective or a mood disorder. (Tr. 455–57.) Plaintiff also has chronic incontinence, including both enuresis and encopresis. There has not been a medical reason given as to why plaintiff is having these involuntary functions. Additionally, these medical diagnoses have not been continual in plaintiff's medical records.

Dr. England found that plaintiff has difficulties in some areas but he is smart (capable of straight As) and he has some friends. Plaintiff has some limitations, but they are not continuous. Plaintiff's GAF has varied from 30 to 56 and as high as 72. Plaintiff has less than marked limitations in reading, but the last set of IQ tests are from 2008. His inability to excel in math and reading could be contributing to his behavioral problems or vice versa. (Tr. 459–63.)

### III. THIRD DECISION OF THE ALJ

On September 26, 2013, the ALJ determined that plaintiff was not disabled. The ALJ found that plaintiff had the severe impairments of ADHD, mood disorder, and oppositional defiant disorder. (Tr. 356–57.) However, the ALJ found that he did not meet a listing. His ADHD does not cause marked inattention, impulsiveness, or hyperactivity and he no longer requires medication for ADHD. (Tr. 360.) His oppositional defiant disorder does not meet a listing, because his symptoms and behaviors do not meet the criteria set forth in Listing 112.08. Although his irritable mood and purported suicidal ideations meet the first component of the listing, his mood

disorder does not pose marked limitations as described in paragraph B1 of Listing 112.02. (Tr. 360–61.)

The ALJ next evaluated functional equivalence by assessing plaintiff's limitations in the six functional domains. Plaintiff had marked limitations in interacting and relating with others. He had less than marked limitations in three domains: acquiring and using information, attending and completing tasks, and caring for oneself. The plaintiff had no limitations in moving and manipulating objects or health and physical well-being. (Tr. 371–77.) In order to functionally equal a listing, plaintiff must have an impairment or combination of impairments that result in either a marked limitation in two domains of functioning or an extreme limitation in one domain of functioning. Plaintiff did not have either, and, therefore, was found not disabled. (Tr. 377.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision." Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogenmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

In determining whether a claimant under the age of eighteen is disabled, the ALJ must undertake a sequential three-step evaluation. 20 C.F.R. § 416.924(a). The three steps are to (1) inquire whether the claimant is engaged in substantial gainful activity, (2) decide whether the claimant has an impairment or combination of impairments that is severe, and (3) determine whether the claimant has an impairment or impairments that meet, medically equal, or functionally equal a listed impairment. Id. A claimant will not be considered disabled unless he meets the requirements for each of these three steps. Id.

If a child has a severe impairment or combination of impairments that does not meet or medically equal any Listing, the Commissioner will decide whether the claimant has limitations that "functionally equal the listings" of disabling conditions promulgated by the Commissioner. See 20 C.F.R. § 416.926a(a). To functionally equal the listings, the impairment or impairments must be of listing-level severity. Id. In other words, to be entitled to benefits, the claimant's impairments must be in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. Id.; Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003).

There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An extreme limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions: What activities can the child perform? What activities is the child unable to perform? Which of the child's activities are limited or restricted when compared to other age-equivalent children who do not have impairments? Where does the child have difficulty with activities – at home, in childcare, at school, or in the community? Does the child have difficulty independently initiating, sustaining, or completing activities? What kind of help does the child need to do activities, how much help is needed, and how often is it needed? 20 C.F.R. § 416.926a(b)(2)(i)-(vi).

These questions are not, singularly, or as a whole, the only factors useful to determine whether or not a child has a "marked" or extreme limitation. 20 C.F.R. § 416.926a(e)(2), (4)(I). If applicable, test scores can be used in combination with other factors, observations, and evidence to determine the level of impairment. Id. "Marked"

or "extreme" limitations as defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with these scores.  See 20 C.F.R. § 416.926a(e)(4).

## V. DISCUSSION

### A. ALJ Assessment of Caring for Oneself

Plaintiff argues that the ALJ erred in finding that P.B.P.'s mental impairments failed to functionally equal a Listing because he did not find a marked impairment in the domain of caring for oneself.  Plaintiff argues that, because the ALJ found marked limitations in plaintiff's interacting and relating with others, there must also be marked limitations in the domain of caring for oneself.  (Doc. 19 at 7–8.)  Plaintiff argues, in the alternative, that if he has improved since 2012, the ALJ should have considered a closed period of benefits from 2007–2012.  (Id. at 13.)  Defendant argues that substantial evidence, including specific events of plaintiff's abilities, supports the finding of only less than marked limitations in the domain of caring for oneself.  (Doc. 22 at 11.)  This court finds that there is substantial evidence supporting the ALJ's decision that plaintiff has improved after the alleged date of onset.

Disability is not an "all-or-nothing" proposition.  A claimant may be eligible to receive benefits for a specific closed period of disability instead of a continuing basis.  Harris v. Sec'y of Dept't of Health & Human Servs., 959 F.2d 723, 724 (8th Cir. 1992); Simpson v. Colvin, No. 1:13 CV 168 NAB, 2014 WL 5313724, at *19 (E.D. Mo. Oct. 16, 2014).  A closed period of disability may be awarded as long as claimant's disability lasts longer than twelve months.  Simpson, 2014 WL 5313724, at *19.  If a claimant improves to a point that he is no longer disabled then disability benefits are no longer appropriate.  See Quaite v. Barnhart, 312 F. Supp.2d 1195, 1200 (E.D. Mo. 2004).  Medical improvement is defined as,

> [m]edical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A

determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s) (see § 404.1528).

404.1594(b)(1).

An ALJ is not obliged to explain all the evidence in the record. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). Failure to reference evidence in the opinion upon which a finding was made does not mean the ALJ failed to consider or rely on the evidence. However, this does not mean an ALJ may pick and choose only the evidence in the record that supports the conclusion. Taylor v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004) (quoting Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004)) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of non[-]disability."); Marnell v. Barnhart, 253 F. Supp. 2d 1052, 1082 (N.D. Iowa 2003) ("The ALJ's failure to substantiate his conclusions adequately constitutes error.") As the Eighth Circuit noted:

> An ALJ may have considered and for valid reasons rejected the … evidence proffered…; but as [the ALJ] did not address these matters, [the court] is unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision.

Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995); see also Taylor, 333 F. Supp. at 856. In doing so, the ALJ fulfills his duty to provide sufficient reasoning for his opinion so a fair and just determination can be made on review.) See also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("Every conflict in the record [need not be] reconciled by the ALJ; the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.")

The domain of caring for oneself is a measure of the child's ability to maintain a healthy emotional and physical state. See 20 C.F.R. § 416.926a(k). School-age children should be independent in most day-to-day activities, including dressing and bathing themselves. See id. § 416.926a(k)(2)(iv). School-age children should also be able to have consistent control over their behavior and avoid behaviors which are unsafe for

them. Id. A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2)(i). An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(3). Possible examples of marked or extreme limitations include: placing inedible objects in the mouth; use of self-soothing activities such as thumb sucking, body rocking, or head banging; being unable to age-appropriately dress or bathe; self-injurious behavior; being unable to enjoy spontaneous activities; and, having disturbances in sleeping or eating patterns. Id. § 416.926(a)(k)(3). Impairments may affect more than one domain at a time, and therefore, should be evaluated as factors in each of the affected domains. Id. § 416.926(a)(c).

The ALJ stated that "the frequency and severity of [plaintiff's] behavioral outbursts has improved significantly since 2008." (Tr. 376) (citations omitted). The ALJ's determination that P.B.P.'s impairments in the domain of caring for oneself are "less than marked" is based on the assessments provided by his teachers and mental health professionals, as well as plaintiff's own statements during several assessments. Several of the documents cited by the ALJ, however, show significant problems in plaintiff's ability to care for himself in 2011 and 2012.

Exhibit 12E details most of the behavior interventions required for P.B.P. during 2007-2008 school year. (Tr. 151–54.) It includes multiple shut-downs, near daily "triage" visits, and multiple incidents of suicidal ideations. Some of P.B.P.'s behavior included: licking the carpet, crawling on the floor, banging his head on objects to the point teachers had to restrain him, extended crying spells, and unacceptable aggression with adults and other students. (Id.)

Exhibit 13E has several different documents from Salisbury R-IV Elementary School. (Tr. 156–231.) There are several disciplinary reports from the 2008-2009 school year detailing incidents such as throwing chairs around the classroom; climbing on classroom furniture and nearly injuring himself; screaming at teachers; suicidal ideations; sticking his head in a toilet; and, running away from school, which required the police to

come. (Tr. 222, 224, 227–31.)  Also included is a questionnaire completed at the end of the 2008-2009 school year from P.B.P.'s teacher, Mrs. Patty Harvey.  (Tr. 156–63.)  In the domain of "caring for himself or herself" Mrs. Harvey noted P.B.P. had very serious problems daily in handling his frustration appropriately and identifying and appropriately asserting his emotional needs.  He also had serious problems weekly in self-soothing, and obvious problems being patient or using appropriate coping skills to meet daily demands of an educational environment.  (Tr. 161.)

In the reports from the 2011-2012 school year, improvement was noted in his IEP,

[h]is coping skills continue to improve.  He handles stressful situations by removing himself.  He occasionally exhibits extreme withdrawal but much less frequently and less extreme behavior during withdrawal than when he first entered the Salisbury school district.  Previously behaviors included licking the floor, drooling and eyes rolling back as he appeared to go into a trance.  Behaviors when upset now may include tapping his pencil or finding an area where he can be alone.

(Tr. 678.)  However, incidents during the school year occurred on February 21, February 27, March 21, and April 23, 2012.  (Tr. 704–09.)  On February 21, 2012, after losing a kickball game, P.B.P. cursed at his teachers, expressed suicidal ideations, and put himself into a situation where injury was likely (rocking back and forth on a table on a stage in the gymnasium).  The coach requested that P.B.P. be excluded from gym class until he could control his emotions.  (Tr. 672–74.)  Also P.B.P.'s mother took him to the emergency room on or around June 20, 2012, but P.B.P. calmed himself down prior to being seen by a doctor and they left against medical advice.  (Tr. 831.)  P.B.P's medical history from that school year appeared to show some improvement.  P.B.P. visited his psychiatrist less often (Tr. 778—79, 775–77, 773–74, 829–34), and his mom noticed a "huge difference" after an increase in his Zoloft dosage.  (Tr. 780–81.)

There was more improvement during the 2012-2013 school year.  For example, P.B.P.'s IEP noted he was handling his problems much better, and he would let adults know when he had a problem.  His reading was still at a third grade level and his math was at a fourth grade level although he was in the sixth grade.  (Tr. 716–62.)  On November 29, 2012, Nurse Baez reported that there had been no issues at school and his

mother was keeping him compliant with his medications. (Tr. 825–26.) P.B.P. was assessed at the University of Missouri on December 13, 2012. This was a comprehensive evaluation with interviews of both P.B.P. and his mother, a battery of tests, and a review of P.B.P.'s medical records. The University of Missouri found that P.B.P. did not meet the criteria for IED or oppositional defiant disorder. He did have ADHD, enuresis and encopresis, adjustment disorder, and his GAF was 60.[7] (Tr. 790–809.) Although on January 5, 2013, P.B.P. was admitted to Royal Oaks Hospital for aggression, including threatening himself and his mother, this was due to his mother's failure to give him his medication. His mother misplaced his medication on a trip to Kansas City, resulting in P.B.P.'s noncompliance for seven days. (Tr. 811–18, 820–23.) After his medications were brought back to proper levels his GAF upon discharge was 72.[8] (Tr. 811–14.) There were no other significant events regarding P.B.P.'s behavior during this school year, indicating significant improvements.

The ALJ failed to distinguish between the later reports and the earlier reports. The ALJ's decision only stated that plaintiff had shown significant improvement from 2008, the alleged onset time. This court agrees there has been significant improvement, but before this improvement there were significant issues regarding P.B.P.'s ability to care for himself, as well as to interact with and relate to others. The ALJ failed to discuss or cite substantial evidence that showed that a closed period of benefits was inappropriate.

## B. Reverse and Award Benefits

Following judicial review, the administrative final decision in a social security disability case may be reversed and remanded for an immediate award of a period of disability with resulting benefits the record overwhelmingly supports a finding of disability and remanding the case for further proceedings would merely delay the

---

[7] A GAF between 51 and 60 indicates that moderate symptoms or difficulty in social, occupation, or school functioning. Id.

[8] A GAF between 71 and 80 indicates that a person only has transient or expected reactions to psychological stressors. There is no more than slight impairment in social or school functioning. Id.

inevitable judgment in favor of plaintiff.  Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000); Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).

Plaintiff is entitled to a closed period of disability.  Careful examination of plaintiff's medical history unequivocally indicates that before November 29, 2012, that P.B.P. was disabled, because he had marked limitation in two domains:  interacting and relating with others and caring for oneself.  Before November 29, 2012, plaintiff was hospitalized twice for his behavior, including suicidal ideations.  (Tr. 208–14, 240–48, 285–87.)  All of his Individual Education Plans indicated P.B.P. had serious problems in a standard educational environment.  (Tr. 112–18, 156–66, 175–81, 694–703.)  His outbursts indicated an inability to maintain a healthy emotional and physical state.  See 20 C.F.R. § 416.926a(k).  Some of P.B.P.'s inappropriate behavior included crawling on and licking the floor (Tr. 222–25); throwing desks and chairs at teachers and fellow students (Tr. 222–25, 229–31, 672); shoving his head in a toilet (Tr. 229–31); running out of the school requiring the police to be summoned (Id.).  All of his teachers' evaluations noted the issues he had with sustaining and completing activities, particularly test taking. (Tr. 112–118, 132–35, 156–63.)  The court concludes the record overwhelmingly supports a finding that plaintiff was disabled from September 1, 2007 to November 29, 2012.  (Tr. 825–26.)

## VI. CONCLUSION

For the reasons set forth above, the court concludes that the decision of the ALJ is not supported by substantial evidence in the record as a whole and it is not consistent with the Commissioner's regulations and other applicable law.  The decision of the Commissioner of Social Security is reversed under Sentence Four of 42 U.S.C. § 405(g) and remanded to the Commissioner for an award of a closed period of disability with resulting benefits.

An appropriate Judgment Order is issued herewith.

_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 8, 2016.